Good afternoon, everybody. The last case on today's docket is In Rain Marriage of Weeks 5-24-0946. Appellant, if you are ready, you may proceed. Please identify yourself for the record. I'm Paige Strong. I appear for Greg Weeks, the appellant. May I please the court, counsel? We raised two issues in our brief, and of course, as usual, there's a lot of subparts to those. Based on the responses from opposing counsel, I think the important issue here to address is standard of review. I think that's going to drive this entire case, and it is the main thing on which we disagree. So let's talk about that. The history of this case is long. It's like 10, 12 years old. It comes from a divorce that was entered on January 6, 2012. It has been to this court already once and remanded back, and here we are again. The underlying situation is that wife's 214-01 petition was granted on summary motion after an evidentiary hearing that went on for a couple of years before the trial court. Ultimately, the trial court granted her summary motion, which means we go right back to the beginning. He based that on a finding of unconscionability, and I can get to that, but that's where we start disagreeing. Our position is that the proper standard of review is manifest way to the evidence. The wife's position is that it is abuse of discretion. Well, that makes sense. That's the highest one, and they certainly don't want us to overcome that, but I believe that the case law actually supports our position. We cited multiple cases that are more recent, which is not what makes them more applicable, but that is significant. More recent than the cases cited by the wife. Her position is that it's an abuse of discretion standard because there are a number of cases, 1986, before around in that area, that thought that was the reasonable approach. Well, since then, there's been a lot of changes, and it seems as if our Supreme Court was a little unsure about what to apply. The most significant decision, people v. Vincent, actually it was dicta what was said in there, so that's what I think raised a lot of questions through subsequent litigation. But the difference between our position and theirs is all the case law since the last 25 years that made a decision one way or the other about what standard of review would be applied says that there's a difference between a decision rendered before an evidentiary hearing and a decision rendered after. Obviously, we had an evidentiary hearing. It went on for a long time. So those cases have determined that the manifest weight of the evidence standard is the appropriate standard to apply to this. And another reason that, and perhaps an explanation of why that may be, is there are a lot of factual things to be decided before you get to determining whether or not the 214-01 petition should be granted. And in this case, those two questions were, did she exercise any due diligence and were the terms of the MSA unquestionable? Those are the factual things that have to be decided before you ever get to the question of whether or not the motion for summary judgment should be granted. Had that been decided without any additional evidence, like maybe six years ago, I would probably be in agreement that abuse of discretion is the right standard. But that's not what happened. In all of this time, much effort put into those underlying factual findings, and that is what makes the standard manifest weight of the evidence instead of abuse of discretion. There's not a single case cited by the WIFE that shows that abuse of discretion is the appropriate standard when there has already been an evidentiary hearing. The two cases cited by the WIFE, Heiroom and Warren County, same deal. They were actually reopening default judgments. It's a different situation than years of litigation with, I can't even begin to imagine how many tens of thousands of pages of evidence submitted to the court and a lot of testimony. So that's the difference. So with that in mind, that manifest weight of the evidence is the correct standard, we need to look at what decisions were actually made. The first point I want to start with is the fact that when this court remanded the case before, there were very specific instructions. It wasn't just remand it and go figure it out. That's not what this court said. The court actually said, let's see, you said some things that are in my paperwork here. It discussed the, the reason you sent it back before is there was no finding about due diligence originally. And so that was the basis of the remand, that that has to be decided, go back and figure that out. And there was no, this court made no opinion on the unconscionability issue, which is what originally brought it to the court, because the due diligence thing had to be decided before you got to that. So that makes sense. I think that's what everyone went into the hearings upon remand to figure out, but got off track a little bit. You can tell throughout the transcripts that there's some confusion about why we're really there and what's really happening. Well, the law is that the due diligence requirement can be relaxed if equity requires, or if it is, the terms are so unconscionable, or any number of reasons can cause the court to relax the requirement for due diligence. Nowhere in any case, nowhere in the statute, nowhere anywhere is there any authority to just throw that out. And that's not what this court said to do. That's what the trial court did. Throughout their decision, regardless of how the trial court dressed it up in language, you can see that it says over and over again, wife showed absolutely no diligence. She didn't do this. She didn't do that. She didn't do 12, 15 different things. No diligence, period, and then goes on to determine unconscionability. The court doesn't seem to make a different decision necessarily than they previously made about unconscionability, but now they have at least combined conversation about due diligence in there. There has to be a difference between relaxing the requirement for due diligence and dispensing with it. If there's not, every case that's ever been decided is in question. It's perfectly, the legislature is perfectly capable of changing statutes and saying, if it's bad enough, you don't require any due diligence at all. That's never happened. That's not the standard. But that's exactly what the court did here. Because of that, they went beyond the scope of your remand. So that's the first problem. They didn't have any authority to completely throw it out because that's not what she told them to do. So that's the first problem that arises in this decision. That's why we put that as our first argument. But the bulk of the argument is in the second argument that we made. There are a lot of factual findings that are just wrong. They're not supported by the record. For example, one of the reasons the court found that the terms of the MSA were unconscionable was that wife was given no income-producing assets. That's simply not true. She was given $1.8 million in cash within a matter of, like, 40 days. Now, that's not the same as having a business necessarily, having car dealerships. It's not the same thing. It's probably safer. When you have car dealerships and businesses to run, you're in a constant role of continuing to reinvest, borrowing more money. You're completely dependent on public coming to your dealership and doing business. You are responsible for however many workers you have. You've got to take care of them. It is a, like many businesses, but somewhat unique to car dealerships, it is a risky, risky proposition. From one day to the next, things can be great and they can be terrible. Now, if you put $1.8 million in the bank, the only thing that you are in danger of is the up and down of interest rates. It doesn't just disappear. It doesn't matter if people no longer want to do business with you. Your money is still there growing money. That's what it does. That's the whole point. You can invest it in another business if that's what you wanted to do. You can pick a good business to do that with. That makes money. But for some reason, the trial court just wrote it off that that's not an income-producing asset and hung up on that a lot. Now, that's not the only thing she was given. She was given property, real estate, shares in an old national bank. All of her debt paid. All of it. All the personal debt of the family paid. She walked away with no obligations. She was also obligated on at least 11 and sometimes twice that, $11 million in debt related to the dealerships, walked away from it. That was the deal. That's pretty significant. That is not in addition to them being wrong about there being no income-producing asset. There's a lot of value in that. A lot of value in those things. For some reason, that just didn't seem to measure up to mean too terribly much to the trial court. I'm not sure that the trial court made a different decision on unconscionability this time than they did the first time, almost as if they felt locked into that position. But for whatever reason, it was decided. The determination was the terms were unconscionable. A lot of effort was put into the fact or a lot of discussion about what W-2s looked like. Well, she worked for the dealership. It was explained that by the actual accountant for the dealership, as to how they determined what to pay people and what to pay her and what to pay my client, it was based on maximizing your Social Security wages. But she had access to everything in the company, and virtually every personal expense ran through the dealership. So what her dollar amounts actually said on a W-2 certainly didn't reflect what her actual income was. Plus, they filed joint taxes. So she has access to all of those things. But what is significant about her amount of money, and I think why they spent so much time on it in the trial court, is no maintenance. No maintenance. Like big signs. She was given no maintenance. He can make all of this money, and she makes $20,000 a year, so no maintenance. That's true. She didn't get any maintenance. That's true. But no court in this case has ever applied the maintenance factors to determine whether or not she would have been awarded maintenance in the first place. There's actually 15 factors to be considered, and it is not completely contingent on there's bigger amounts of money in this account as compared to this, or he can earn this and she can earn that. There's much more to it. It's not just math. It is need. Where are her needs? She has to pay for her house. She has no credit debt. She has to pay for a car, boats, jet skis, toys, other houses that she can do things with, and $1.8 million. What are those needs? It wasn't really developed, because nobody ever talked about it, which means the trial court couldn't possibly have evaluated that fairly. So when they say, when the court says she was given no maintenance, so that's terrible, and so there's a reason why it's unconscionable, we can't know that. We have absolutely no idea if that should play a role in unconscionability or not, because it wasn't developed. Those facts aren't out there. And so that is another thing that it seems as if it was obviously a major factor in determining whether or not the terms of the MSA were unconscionable. But essentially based on, like, you know, a castle built on the sand, what does it mean? We don't know if that is an important factor, if it even favored her. We don't know. There are obviously other factors involved there, about half of the maintenance factors that would apply in this case, which we talked about in our brief. But the fact that I gave it more attention in my brief over a number of pages than the trial court did over 12 years is a little concerning, because it's a huge factual issue that was just not a part of this case. So if you take out the factual errors that the court made, and they're not really questionable errors, they're apparent of record when you review the evidence versus what the findings are, not credibility sort of things, you can see that it is not as unbalanced as the court felt as if it was, as if the terms were. And this brings us back to due diligence a little bit, but not completely. Contract terms are unconscionable for a number of reasons, one being what are the circumstances under which the deal was made? That's the first factor. Then we go on to the second factor of are there unreasonably favorable terms to another party? That's not the only factor. We all seem to be acting as if unreasonably favorable terms to one party is the only decision that has to be made here, and that's not the case. Now, I've already talked about how there's a lot of misapplication of facts to determine that it was unreasonably favorable. But what about that first point? What were the circumstances under which she made this choice? Which, by the way, she negotiated this divorce. She negotiated it. She asked for what she wanted, and she got it, even when it was triple what the original arrangement had been. That's significant. What the actual reasoning was for what she did, she had a boyfriend. She wanted out. She did not like the fact that a new dealership was being built that she thought was a huge risk and a bad idea. She walks away, and that's not her problem anymore, is it? She had decision-making ability of her own, and she used it. That is important to recognize that she was not someone this was done to. She was an active participant who had her own reasons for doing what she was doing. And to interfere with those just based on a misapprehension of math is essentially insulting. It's insulting to her as if she was not intelligent enough to ask for what she wanted and to get it. Why in the world after this, 12 years later, it should be reconsidered in light of she changed her mind. That is not how the law is supposed to work. That is not about finality. That is not about applying the law consistently to everyone. That's about seeing big dollar numbers in this case and not looking any further. That's what it was about. So I think if you apply the manifesto way to the evidence standard, you'll find that the trial court's factual decisions were incorrect or based on not information, just presumption, like about maintenance. And that without that information, she does not actually meet her burden anywhere. She doesn't meet it at all. And the 214-01 petition should not be granted. This case should be over. It should have been over a long time ago. It should be over today because she did not meet her standard at all. And the only way you get there is if you throw out all of the factual errors the court made and agree that it is okay for the trial court to go make decisions that exceed the scope of what you told them to do and effectively change all the law by throwing out the due diligence requirement completely. That's the only way this case should be affirmed. It's the only way. And that's like nine reasons why it shouldn't be. It's not how this is supposed to work. So we would ask that you would reverse the decision granting summary motion and put an end to this once and for all. Any questions, Justice? No questions. No questions. Thank you. We're going to give time for Rebecca. Will you please identify yourself for the record and you may proceed. My name is Steve Stone. I'm here for Kim Weeks, the appellee. May it please the court. Two of the justices on this court know me a little bit. They know that my first stop in my legal career was in this institution. I was Judge Howerton's clerk, and the reason I bring that up is because from 1990 to 1992, I got to work with Justice Welch. And I wanted to use some of my time to just recognize his service, 45 years to this court, and offer my condolences to the court and to the court family. I was honored to spend a little time with him, and I know that all of you were too. And so to Justice Welch. With regard to the merits of this case, I do think there's a disagreement on the standard of review. The cases I cite come from the Illinois Supreme Court. The Illinois Supreme Court says it's an abuse of discretion standard. The appellate courts have said it's an abuse of discretion standard. I will give some credit to Ms. Strong that I think on factual issues, there's a manifest weight component when you are finding facts that then you are going to exercise your discretion upon. And so I don't think it's ridiculous to suggest that manifest weight is part of an analysis, but the ultimate decision is abuse of discretion, which as this court knows means that it has to be arbitrary or fanciful or no judge would ever do what Judge Thurston did in this case, which was to find that it was manifestly or unconscionable, substantially unconscionable. As far as the findings of fact, what facts might have been in dispute? Well, I think the only findings of fact that are alleged to be in dispute are what is net worth, what the net worth of the parties were. I mean, a year before the divorce, they had a net worth of almost $12 million, $11 something million. A year after the divorce, after giving Kim $1.8 million, Mr. Weeks alone had a net worth of $13 million. Now, these were admissions in the trial court, admissions. And there is an effort in the appellate court to suggest, well, Judge Thurston didn't really take into account debt. And they come up and they put in the evidence, here's some debt, and that should question net worth. But all that does in the trial court is set up a circumstance where Mr. Weeks, when he wants to borrow money, when he wants to communicate with GM, when he wants financial institutions to know how much money he's worth, he has one number, $11 million before the divorce and $13 million after. But when he's trying to divide assets with his wife of 26 years and the mother of his children, well, it's a different number. And, I mean, we know that we cannot, in one setting, say I'm worth $11 million, and then when it comes to dividing the assets of a 26-year marriage, it says I'm not worth nearly that amount. So there is an argument as to what the net worth is. And there is evidence that could cast some doubt, factually, I guess, onto what ultimately the net worth is. But even if you use Manifest Way, just for the sake of argument, use it, the opposite result has to be clearly apparent. Well, if that's true, you have to read out of the record that he endorsed financial documents saying I'm worth $11 million a year before the divorce and I'm worth $13 million after. After giving her 1.8, you have to read that out of the appellate record. And keep in mind, when you're using the abuse of discretion just on the granting of the petition, if you use Manifest Way, credibility still is at issue. Judge Thurston is in the courtroom. He encounters his explanation, the husband's explanation for why is it $11 million in this setting, but it's something different in this setting. And Judge Thurston, I think, made a credibility determination that, you know, the way you now calculate your net worth in this setting, in the divorce setting, is a lot different than when you're talking to the bank. And Judge Thurston, I just thought, held that against him. And she probably should hold it against him on an issue of credibility. And, I mean, I don't mean any disrespect to Mr. Weeks, but you have the appellate record. And when you read Mr. Weeks' testimony in his deposition, his testimony in court, the man did not answer a direct question very often. And the court had to admonish him. You know, answer the question, answer the question. And I think, you know, these are all family cases are emotional, and there's a high level of consternation. And I get it. Tensions are high. But I think Judge Thurston saw, in the way he testified, that he just didn't give straight answers. He would answer questions with questions, or he would argue about the question asked. And maybe Mr. Harvey draws that out of people. But it's still disrespectful to the process, and it was disrespectful to the court. And I think Judge Thurston saw that. So we know the Supreme Court says, overall, what you have to look at is this is an abuse of discretion when it comes to exercising the equitable powers of the court. And why? When is something substantially unconscionable? When it's just so manifestly unfair. And when you evaluate if Judge Morris had known. When Sandbanks walked this case in on a Friday without notice to anybody. This was all done in one week's time, as you recall from the record, initially. And I know you guys read the records that the court does. But these people came home from a vacation on a Sunday, fighting like cats and dogs. The wife left the house early in the morning, I think on a Tuesday. Mr. Weeks shows up on Tuesday morning and collects his wife and says, we're going to go to a different county, not where we live, not where our businesses are. But we're going to go down to Sandbanks and Saline County. And we're going to have him give us a divorce. And in two days, they had a marital settlement agreement hashed out where she got 18% of the marital estate. And they walk it in front of Judge Morris. And the testimony is, Ken Weeks didn't know what the net worth was. Sandbanks didn't know what the net worth was. And the judge didn't know what the net worth was. And I think I know Walden Morris well enough to know that if he had known it was an 18 to 82 split, he might not have signed it in that informal way where she's pro se and he's got a lawyer. I mean, so just the whole procedural part stinks. But in the end, Judge Thurston says, setting aside that, 82-18 is just not fair. And no circuit judge is going to endorse that with a signature and say this is fine when she doesn't get alimony, she doesn't get health insurance, and she loses her job. And I get it. $1.8 million is a lot of money, but not when it's compared to $12 million. And that's what's manifestly unfair. And now I'm not here to argue that Kim used due diligence because Judge Thurston said she didn't. And I know that that's an abusive discretion standard. So I wasn't going to come up here and stomp my feet and claim that she exercised due diligence when I know that the standard means that no judge would ever find that. He found it. I'm not arguing that. But he went to the next point, which, in your opinion, Judge, you said she could do it, which is you need to have an evidentiary hearing on due diligence, and then if you want to, you can examine unconscionability, which she did. And so even if that part is manifest way, is the opposite conclusion clearly apparent that it wasn't an 82-18 split? Well, if it was clearly apparent, the only way you get there is to take away his admissions, admissions of record. We were worth together $11 million in 2010. And a year after the divorce, I, by myself, after giving her $1.8 million, was worth $13 million. So the notion that he can, in one setting, say this is what I'm worth, GM, both before and after the divorce, but in the divorce he says, no, no, no, no, I'm not worth anywhere near that. And Ms. Strawn says, well, the judge didn't take into account debt. Well, debt's a double-edged sword. Debt means debt worthy. As we all know, when a financial institution loans money to you, that's an asset to the bank. And they only loan money to people because there is an economic engine that will pay off that debt. And Mr. Weeks got the economic engine. We're not saying that she couldn't put $1.8 million in a savings account and back then earn .02 interest. She could have done that, I'm sure. But as a couple, they made $1 million a year. Out of that, $20,000 was her share. That's how much she generated. After the divorce, he was making $900,000, after giving her $1.8 million. $900,000 in the year after. That's according to the tax returns. So the economic engine that he got, which was the dealerships and the businesses and the coal mining assets, and his 401K, which wasn't even in the marital settlement agreement, which was a couple hundred thousand dollars and accounts up to $100,000, never mentioned. And Sam Beggs, I mean, I know Sam. Judge Bowie knows Sam. You probably do. He testified. I didn't credibly. I didn't know how much they had. I'm just working on numbers. So the issue here isn't due diligence. We're not arguing that. The issue here is just was it unconscionable. And I think when you go through the process of how you got to this agreement and how manifestly unfair the agreement is, you can see that Judge Thurston did not abuse his discretion. In fact, he exercised the very equities that our legislature gives to the court and allows him to set aside due diligence. I'll leave you with this comment. The strong said no court has ever said that you can relax due diligence and just decide the case on substantive unconscionability. Johnson says that. That's exactly what Johnson says. So there is a court that says it, and in fact, Judge Thurston relied on that case in his decision. So in some ways, I think any time you're up here, the issues are never easy. But I think if you apply the standards that the Supreme Court says that we apply, even if you apply Manifest Wade on the findings of fact, I don't think this court will find that the opposite result is clearly apparent. What would be the opposite? The opposite would be that he either lied to the GM when he said how much money he had when he needed money for his dealership, or he's with a wink and a nod saying I'm not worth as much as I said. So we would ask you to affirm and remand for further proceedings. Thank you. Forgive me. Rebuttal? I just have a few points. I want to correct a couple of pieces of, I think, just misstatement. The argument, it actually was written in the brief as well, that she didn't get health insurance. That's not true. She had health insurance for another year. That was also part of the deal. So that is inaccurate. The idea, also, the argument that this happened so quickly, if you read that, actually read the transcript, you'll find out they'd actually filed for divorce before and then had changed their minds about it because they had young children, or younger children, minors at least, and it was too much, so they backed out of that. So none of this was a surprise to anybody at all. The testimony from wife's friend, for Pete's sake, who said, I begged her to slow down. She wouldn't. She didn't listen. She wanted to go through with it. I think those things do matter as well. But the most important thing that I think has to be corrected from opposing counsel's argument is it does not matter what his income was a year later. It doesn't matter. The law is as clear as it can be is you evaluate that on the day of the deal, the day that it is entered, January 6, 2012. Not when you file some taxes the following year. That doesn't make a bit of difference. It matters on that day. And on that day, as liquid assets, essentially, were committed to paying her $1.8 million, which essentially liquidated one entire account and some others as well. But what happens after that? It'll make a bit of difference. Now, because it was such a focus, the trial court as well, there was a lot of discussion about how much income there actually was the next year. In fact, the tax returns showed that over $400,000 of that was a grant for something else, wasn't actual income, couldn't have been used that way, and then some gambling winnings that also didn't exist. But none of that matters. It doesn't matter. The day that it matters is January 6, 2012. So that's what you need to be looking at is what were their comparative situations there. But you still don't get there by skipping over the first step. And if you look at many of the cases that they did find that relaxing due diligence was okay or should happen in the name of equity, there's almost always, if not always, another factor. Fraud, concealment of assets, virtually every case has been like that. There's a very similar case, I think out of the first district, where there was about $20 million in assets their husband lied about and said there was like eight or nine. Well, it turns out there were 20. That was straight fraud. That's why that deal was unconscionable, not just because it was unbalanced. There's not a rule that it can't be unbalanced. It has to be equitable. And when you add in all these other factors, it was equitable. It was also the result of what she asked for. This did not get sprung on her in the morning. We run off to another county and lay it on her. That's not what happened. The idea that no notice was given to anyone on a Friday to go in and have it entered by the court. Who else would you give notice to but the two parties who were there, questioned by the judge and answered the questions? I don't know who else you give notice to. Those are all kind of red herrings. That is not a reasonable interpretation of what went on. You can see that from the transcripts. She acknowledged this is what she wanted. She thought it was fair and reasonable. She knew what her assets were as much as Greg did. And, frankly, I don't think either of them knew. It doesn't matter what everybody else knew. They knew. She signed all those same documents he did. She signed the GM application. She signed the taxes. And she was a signatory and had access to every checking account they had. She ran billing at the dealerships. How much more well-versed could she have been? So those were decisions she made. She chose to do this for her own reasons. And there's no reason to undercut that because she changed her mind. And that's what it comes down to. That's all that we ask that you vacate or reverse the trial court's decision granting summer judgment. Any final questions? No questions. Thank you. Thank you very much, counsel, for your arguments. That will conclude the docket for today. And this court will now stand in recess until September document. All right. Thank you.